_____

No. 95-1531EM
_____

Wayne Kennedy and                       *
Alice Kennedy,                          *
                                        *
            Appellants,                 *
                                        *
      v.                                *
                                        *
                                        *   On Appeal from the United
                                        *   States District Court
C. Keith Schafer; John                  *   for the Eastern District
Twiehaus; Robert O. Muether;            *   of Missouri.
Jacqueline Howard; Kelly Shaw;          *
and Peggy J. Dunlap,                    *
                                        *
                                        *
            Appellees.                  *

                     _____

       Submitted:  September 14, 1995

          Filed:  December 4, 1995
                     _____

Before RICHARD S. ARNOLD, Chief Judge, HEANEY and HANSEN, Circuit Judges.
                     _____

RICHARD S. ARNOLD, Chief Judge.


     Wayne and Alice Kennedy brought this suit under 42 U.S.C. § 1983 against officials of the Missouri Department of Mental Health and Hawthorn Children's Psychiatric Hospital, a state facility.  They allege that defendants deprived their 15-year-old daughter, Kathleen, of her due-process right to a safe and humane environment while she was a patient at Hawthorn.  That deprivation, they assert, led to Kathleen's suicide.  The District Court granted the defendant's motion for summary judgment, holding that, because

Kathleen was voluntarily admitted to Hawthorn, she had no "liberty interest" in a safe and humane environment, thus precluding liability under Section 1983. We reverse that order because there is a genuine issue of fact concerning whether Kathleen, at the time of her death, was a voluntary patient.

I.

At this preliminary stage of the case, we accept the Kennedys' version of the facts. In October of 1991, Kathleen was admitted to Hawthorn as a voluntary inpatient at her parents' request. Immediately before Kathleen's admission to Hawthorn, she had been a psychiatric inpatient in a private hospital. Her parents' insurance coverage had been exhausted, necessitating the move. The Kennedys had been advised that, if they did not voluntarily admit Kathleen to a mental-health facility, Kathleen would be involuntarily committed. The only affordable option open to them was a state-run facility where they would be charged in accordance with their ability to pay. Thus, Kathleen was admitted into Hawthorn, a state facility.

Kathleen remained an inpatient at Hawthorn for several months. On March 30, 1992, due to her mental condition and her expressed desire to commit suicide, she was placed on the precaution "1:1 Constant Staff Supervision." Patients under this precaution must be within the eyesight of, and no more than three feet away from, staff members at all times. On April 3, 1992, Kathleen was placed on "Protective Suicide Precautions." This precaution is for patients who are at a "moderate to low risk" for suicide, and requires nursing staff members to keep the patient "in constant eye-sight." Additionally, the nursing staff must directly interact with these patients every 15 to 20 minutes so that changes in their mental status or behavior may be detected.

Kathleen remained under Protective Suicide Precautions on the

evening of April 8, 1992. That day, the staff in Cottage D, where Kathleen was residing, told Hawthorn's nursing supervisor, defendant Peggy Dunlap, that the number of nurses assigned to work the evening shift was inadequate to meet the patients' needs. Dunlap failed to find additional help, and, in fact, declined an offer by the day-shift supervisor to help locate additional nursing assistance. Compounding the problems, the charge nurse in Cottage D who was responsible for assigning a staff member to care for Kathleen failed to do so. This charge nurse was, at the time, on extended probation because of her past deficiencies in assigning work duties to the nursing staff.

The evening shift began duty at 2:30 p.m. on April 8. Kathleen was not in the "constant eye-sight" of any nursing staff member. No one interacted with her every 15 to 20 minutes. When someone finally checked on her at 5:10 p.m., she was dead, hanging from a bed sheet in her room.

The Kennedys allege that these staffing problems were nothing new for Hawthorn. They assert that employees had complained about the chronic understaffing on several occasions. Moreover, they claim that Hawthorn officials falsified records, causing the staffing needs of the hospital to appear to be less than they actually were. These actions, they contend, establish a pattern of deliberate indifference to the health and safety of Hawthorn's patients. This deliberate indifference, in turn, deprived their daughter of her constitutionally protected liberty interest in a safe and humane environment.

The District Court held that the defendants were entitled to summary judgment on two grounds. First, it held that Kathleen had no constitutionally protected liberty interest because she voluntarily entered Hawthorn. Second, even if Kathleen did have a protected liberty interest, that right was not clearly established at the time of her death, thus entitling the defendants to

qualified immunity.

II.

The Due Process Clause of the Fourteenth Amendment ensures that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."  The Supreme Court has held that the "deprivation of liberty" which triggers "the protections of the Due Process Clause" is "the State's affirmative act of restraining the individual's freedom to act on his own behalf -- through incarceration, institutionalization, or other similar restraint of personal liberty."  DeShaney v. Winnebago Cty. Dept. Soc. Servs., 489 U.S. 189, 200 (1989).  This Court has interpreted DeShaney as "impos[ing] a duty on state actors to protect or care for citizens" when one of two circumstances exists.  Gregory v. City of Rogers, 974 F.2d 1006, 1010 (8th Cir. 1992) (en banc), cert. denied, 113 S. Ct. 1265 (1993).  The first exists when the state limits an individual's ability to care for himself in a "custodial [or] other setting[ ]."  Ibid.  The second exists when the state exposes one to danger that he would not have faced otherwise.

The District Court's order and the majority of the parties' arguments in this Court have focused on whether a voluntary patient in a state mental hospital could ever have his "ability to care for himself" so limited as to create a liberty interest in a safe and humane environment.  The Kennedys argue that the manner in which a patient enters a hospital is not the dispositive question.  Rather, they encourage us to look to the amount of control the state actors, here hospital employees, exerted over Kathleen's life.  Cf. Walton v. Alexander, 44 F.3d 1297, 1306 (5th Cir. 1995) (en banc) (Parker, J., concurring specially).  If we do so, they say, it will become apparent that no distinction should be made between voluntary mental patients and involuntary mental patients, who unquestionably do have a protected liberty interest in a safe and

-4-

humane environment.  See <u>Youngberg v. Romeo</u>, 457 U.S. 307 (1982).

The argument may have merit.  In fact, this Court accepted it before <u>DeShaney</u>.  See <u>Goodman v. Parwatikar</u>, 570 F.2d 801 (8th Cir. 1978).  Nevertheless, other circuits, after <u>DeShaney</u>, have refused to grant due-process protection to those who voluntarily entered the State's custody.  See <u>Walton</u>, <u>supra</u>; <u>Monahan v. Dorchester Counseling Center</u>, 961 F.2d 987 (1st Cir. 1992); <u>Fialkowski v. Greenwich Home for Children, Inc.</u>, 921 F.2d 459 (3rd Cir. 1991).  Armed with these cases, the defendants argue that <u>Parwatikar</u> has been overturned by <u>DeShaney</u>.  We, of course, are not bound by these cases, and the case before us could, conceivably, be distinguished given Kathleen's youth and mental state.  We need not address this issue, however, because the question was sufficiently doubtful, viewed from the perspective of a reasonable state official at the time of Kathleen's death, to make it impossible for us to say that the law was clearly established at that time in favor of the existence of a due-process right on the part of a voluntarily admitted patient.  In other words, we agree with the District Court that defendants are entitled to the defense of qualified immunity if Kathleen is properly classified as a voluntary patient.  We need not and do not decide whether <u>Parwatikar</u>'s holding in favor of voluntary patients' due-process rights remains good law.  We do decide that an action for damages brought by a voluntary patient is subject to a qualified-immunity defense.

This holding is not the end of the case, however.  Voluntary mental patients in Missouri may be released upon request, or, if they are minors, upon the request of their parents.  Mo. Rev. Stat. § 632.155(1).  But if the head of the facility where a minor is a patient "determines that the minor is mentally disordered and, as a result, presents a likelihood of serious physical harm to himself or others, the head of the facility may refuse the release."  Mo. Rev. Stat. § 632.155(2).  Included in the definition of "serious physical harm" is "a substantial risk that harm will be inflicted

by a person upon his own person, as evidenced by recent threats, including verbal threats, or attempts to commit suicide or inflict physical harm on himself." Mo. Rev. Stat. § 632.005(9)(a). Notably, the application for admission signed by Kathleen's mother upon her admission to Hawthorn repeats this statutory language nearly verbatim.

This language indicates that once Kathleen was placed on Protective Suicide Precautions she may have effectively become an involuntary patient. Certainly she no longer had the absolute right to leave the hospital by simply requesting to be released. The defendants argue that it is mere conjecture to try to determine what Hawthorn officials would have done if Kathleen had requested to leave. We doubt that they would have released a patient who presented a risk of suicide so great that her doctors required the nursing staff to keep her constantly in their sight. Moreover, what defendants would have done if Kathleen's parents had tried to take her out of the hospital is not the only issue at stake. At the oral argument before this Court, the defendants stated that Kathleen would almost certainly have been released under certain circumstances, to another institution or to a home-health care arrangement, for example. But that is exactly the point. She would have been required to make some showing before she could have been released. She had no absolute right to leave.

The record before us, however, is not sufficient to allow us to conclude, as a matter of law, that Hawthorn had so restrained Kathleen's "freedom to act on [her] own behalf -- through incarceration, institutionalization, or other similar restraint of liberty" that the "protections of the Due Process Clause," DeShaney, supra, 489 U.S. at 200, were triggered. Presumably, the record is sparse because the defendants and the District Court believed that Kathleen's status upon admission was dispositive. On remand, it should be determined whether Kathleen's condition at the time of her death presented such a "likelihood of serious physical

-6-

harm" that Hawthorn could lawfully have detained her if either she or her parents had requested her release. If so, the "situation" that she was in was "sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect." DeShaney, 489 U.S. at 201 n.9.

As we have noted, this disposition makes it unnecessary to address the question whether a voluntary mental patient enjoys the same due-process protections as an involuntary patient. It is prudent, and in keeping with the precedents, to postpone consideration of this difficult constitutional question until we are certain that its consideration is necessary. Cf. Federation of Labor v. McAdory, 325 U.S. 450, 461 (1945).

### III.

Our Brother Hansen suggests, post at 11, that our reasoning "create[s] a constitutional right to involuntary commitment status whenever a patient's condition is such that she could lawfully be detained." With respect, we believe that this characterization of our holding is mistaken. We hold only that a Missouri statute may effectively restrain those in Kathleen's condition and under the care of the State from acting on their own behalf to such an extent as to trigger the protections of the Due Process Clause. It is not Kathleen's worsening medical condition alone that may have converted her status to that of an involuntary patient. Rather, her worsening condition plus the duty placed on state officials by the statute may have had this effect.

In this connection, another statute, Mo. Rev. Stat. § 632.300, is relevant. Under this provision, if the defendants had become aware of Kathleen and her condition while she was outside their care, they would have been required to investigate and evaluate her condition. Mo. Rev. Stat. § 632.300(1). If they had determined that she posed a "likelihood of serious physical harm" to herself

-7-

and that that harm was "imminent," they would have been <u>required</u> to commit her involuntarily.  Mo. Rev. Stat. § 632.300(2).  By a parity of reasoning, a patient already in custody as the result of a voluntary commitment surely has no absolute right to be released when her condition has worsened in the way that Kathleen's did in this case.

The dissenting opinion also suggests that, even if Kathleen had become an involuntary patient, defendants would have a qualified-immunity defense.  It is true enough that there is no case on all fours, at least none that we have found.  But the precedent in this Circuit, in the form of the <u>Parwatikar</u> case, discussed above, is clear at least that involuntary patients have due-process rights.  No one contends that <u>DeShaney</u> or any other case has impaired or cast doubt on this aspect of our holding in <u>Parwatikar</u>.  We see no reason why a patient originally committed voluntarily must retain that status permanently.  Facts change, and legal status follows facts.  This chain of reasoning is not obscure and, we think, would have been apparent to a reasonable state official at the time of the events that gave rise to this case.

IV.

The judgment of the District Court is reversed.  A genuine question of material fact exists concerning whether Hawthorn had restricted Kathleen's ability to act on her own behalf to such an extent that she had become, in effect, an involuntary patient.  The cause is remanded for further proceedings consistent with this opinion.

HANSEN, Circuit Judge, dissenting.

I respectfully dissent.  Our court remands for further findings concerning whether Kathleen Kennedy's change in mental

condition and course of treatment may have effectively converted her status from that of voluntary patient to involuntary patient. If so, then the court states that this situation is sufficiently similar to incarceration or institutionalization to give rise to § 1983 liability for a failure to protect. My dissent is twofold: First, I fail to see any disputed facts that might indicate that Kathleen's patient status changed from voluntary to involuntary, and second, even if there is a genuine dispute of fact on this issue, I believe that the imposition of liability arising from such a de facto change in status was not clearly established law at the time of this tragedy.

In order to give rise to a constitutional duty to protect, both DeShaney, 489 U.S. at 199-200, and our opinion in Dorothy J. v. Little Rock Sch. Dist., 7 F.3d 729, 732 (8th Cir. 1993), require a showing that the state by some "affirmative exercise of its power" restrained an individual's liberty against her will and rendered her unable to care for herself. In my opinion, after DeShaney, the voluntary admission of a mental patient does not result in the required state-imposed restraint of liberty, against the patient's will, that is necessary to establish liability for failure to protect. Nor can the worsening of the patient's mental condition and a change of treatment modality to more frequent observations substitute for the affirmative exercise of liberty-restraining state power.

It is undisputed that at the time of her admission, Kathleen was a voluntary mental patient. She was admitted, not committed. Her course of treatment required that she be placed under Protective Suicide Precautions, a medical status which mandates frequent interaction with and constant supervision by staff members. This medical status, which was part of her voluntarily requested treatment, is the only possible showing of an affirmative exercise of state power that can be found in this case. Our court's opinion concludes that there might be an issue of fact by

speculating that once Kathleen was placed under Protective Suicide Precautions she may have effectively become an involuntary patient because her mental condition was such that _if_ her parents had requested her release, the director _could_ (not would) have exercised his discretion to refuse her release. Finding no facts to support this speculation, I respectfully disagree.

Under Missouri law, it is possible that a voluntary minor patient's admission status may change to that of an involuntarily detained patient if the minor patient or her parents request her release, and the release is denied. By statute, the head of a facility "may refuse" the release of a voluntarily admitted minor patient when the patient is both "mentally disordered and, as a result, presents a likelihood of serious physical harm to himself or others," but may do so only if an application for detention is made to a Missouri court. Mo. Rev. Stat. § 632.155(2). This statutory authority to refuse the release of a voluntarily admitted minor patient, however, is discretionary with the head of the facility, not mandatory upon a showing of the requisite mental condition. In that respect I disagree with the court's characterization of this provision as a "duty placed on state officials." _Ante_. at 7. Until the head of a facility is presented with the opportunity and actually exercises the authority to refuse the release of a voluntary minor patient, the state has not taken any affirmative action to restrain the voluntary patient's liberty against her will within the meaning of _DeShaney_. Importantly, the record in this case contains no assertion or evidence that Kathleen's course of treatment was against Kathleen's will or her parents' will, or that her parents sought to remove Kathleen and were denied release from this course of treatment.

Instead of pointing to disputed facts that might demonstrate an affirmative exercise of power by the state, our court's opinion suggests that the status of a patient can change automatically from voluntary to involuntary whenever the patient's condition is both

-10-

"mentally disordered" and poses a "likelihood of serious physical harm" to herself or to others as described in Mo. Rev. Stat. § 632.155(2), such that the director "could lawfully have detained her if either she or her parents had requested her release." Ante at 7 (emphasis added). Under this reasoning, the mere treatment of a serious mental condition which falls within the terms of the statute becomes a state-imposed restraint of liberty. If this be true, then I fear that we have effectively obliterated the rule that a duty to protect arises only when the state affirmatively exercises its power to restrain a person's liberty against the person's will. See DeShaney, 489 U.S. at 200; Dorothy J., 7 F.3d at 732.

Furthermore, the de facto evolution from voluntary to involuntary status based upon a worsening medical condition as suggested by our court would actually create a constitutional right to involuntary commitment status whenever a patient's condition is such that she could lawfully be detained. This cannot be. There is no constitutional right to involuntary commitment, regardless of an individual's mental condition. See Wilson v. Formigoni, 42 F.3d 1060, 1066 (7th Cir. 1994).

Our court's opinion, ante. at 7, asserts that Rev. Mo. Stat. § 632.300(2) (requiring a mental health coordinator to "request a peace officer to take or cause [a] person to be taken into custody and transported to a mental health facility" if the mental health coordinator has reasonable cause to believe that the likelihood of serious physical harm by such person to himself or others as a result of a mental disorder is "imminent") creates a duty which, by parity of reasoning, indicates that a patient with similar mental health problems already at the facility has no absolute right to release. Here again our court substitutes the mere existence of unexercised state power for the reality of affirmative state action. Kathleen's parents were absolutely free to remove her from the hospital unless and until a state actor exercised the power to

detain her authorized by the Missouri statute.  In my opinion, neither the possibility for detention under this statute nor the reasoning employed by our court can create affirmative state action in a case where none in fact has occurred.  Although "[f]acts change," ante. at 8, and although the facts of a given case could indicate a change from voluntary to involuntary status if they included an actual decision to detain made under the statute,  I maintain that unless the facts of a case indicate that the state has affirmatively acted to restrain a person's liberty, they are insufficient to subject state actors to § 1983 liability.  An unexercised discretionary power under state law to detain and evaluate a person with apparent mental health problems is not the kind of affirmative state action DeShaney requires as a prerequisite to § 1983 liability.

To summarize, Kathleen was voluntarily admitted, not committed, and there is no evidence to suggest that her status as a voluntary patient actually changed before her tragic and untimely death.  Her parents did not request her release, there is no indication that she was restrained against her will or her parents' will, and there is simply no dispute of fact to suggest any affirmative exercise of power by the state that was keeping Kathleen restrained of her liberty at the time of her death.

Even assuming arguendo that it is possible to demonstrate a question of fact concerning whether Kathleen's worsening condition combined with more frequent medical observation resulted in an affirmative state act restraining Kathleen's liberty in a manner similar to that of involuntary institutionalization, the qualified immunity defense remains available because this certainly would be new law since DeShaney, and it cannot be said to have been clearly established at the time of Kathleen's death.  My research has revealed no cases indicating constitutional liability in this type of situation after DeShaney and prior to the filing of this opinion.

For these reasons, I would not remand for more factual inquiry but would affirm the district court's grant of qualified immunity.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.