# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 11-1822

_____

Amber Shelton, as Administratrix of      *
The Estate of Brenda Shelton,            *
Deceased,                                *
                                         *
        Plaintiff - Appellant,      *
                                         *  Appeal from the United States
     v.                        *  District Court for the
                                         *  Eastern District of Arkansas.
Arkansas Department of Human             *
Services; Cheryl Miller, Individually,   *
and in Her Official Capacity as an       *
Employee of the Arkansas                 *
Department of Human Services; Sharon     *
Thompson, Individually, and in Her       *
Official Capacity as an Employee of the  *
Arkansas Department of Human             *
Services; John Schay, Dr., Individually, *
and in His Capacity as a Physician at    *
the University of Arkansas System;       *
Levita Fisher, Individually, and in Her  *
Official Capacity as an Employee of      *
Arkansas State Hospital; Rosalind        *
Hunter, Individually; Albert Kittrell;   *
Linda Parker; Charles Smith,             *
Individually, and in His Official        *
Capacity as Administrator of The         *
Arkansas State Hospital,                 *
                                         *
        Defendants - Appellees.     *

Submitted: January 12, 2012
Filed:  May 15, 2012

Before WOLLMAN, LOKEN, and MELLOY, Circuit Judges.

MELLOY, Circuit Judge.

Amber Shelton, as the administratrix of Brenda Shelton's estate, appeals the district court's[1] dismissal of her civil action against several public officials and health professionals.  The complaint alleges shortcomings in the way medical professionals at a state mental health facility responded after Brenda hanged herself while a patient at the facility.  The complaint alleges state law tort claims, a federal constitutional substantive due process claim, and federal statutory claims pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., and the Rehabilitation Act, 29 U.S.C. § 794.  The district court dismissed all federal claims with prejudice and dismissed the state law claims without prejudice, electing not to exercise jurisdiction over the state law claims.  We affirm.

I.      Background

Brenda Shelton voluntarily admitted herself under Dr. Linda Parker's care to the Arkansas State Hospital on October 20, 2008, and was immediately placed on suicide watch.  At Dr. Parker's instruction, Brenda was later taken off of suicide watch.  In late October, three days after being taken off of suicide watch, Brenda hanged herself in her room.

---

[1]The Honorable J. Leon Holmes, Chief Judge, United States District Court for the Eastern District of Arkansas.

When discovered by nurses, Brenda was still alive. According to the complaint, nurses refused to administer mouth-to-mouth resuscitation because no protective shields were available. Also according to the complaint, nurses were authorized by facility policy to withhold such care in the absence of protective shielding. Further, the unit within which Brenda was housed had recently changed location within the overall facility, and ambulatory breathing bags that allegedly would have aided in her rescue were in a locked storage room. At the time, the storage room could not be accessed because a nurse had accidentally locked the key for the storage room inside that room. Appellant alleges that one nurse was specifically instructed not to administer mouth-to-mouth assistance. When a physician, Dr. Schay, arrived he also did not administer this form of aid.

Days later, Brenda died. Appellant brought the present action against the Arkansas State Hospital, the Arkansas Department of Human Services, several nurses, several physicians, and supervisory state actors. The complaint alleges facility policies, supervisors' failure to train nurses, and the defendants' failures to act following their discovery of Brenda all contributed to Brenda's death. The complaint also alleges these shortcomings caused Brenda increased suffering prior to death and increased her medical expenses. The complaint alleges a substantive due process violation, state law tort claims, and federal statutory claims asserting that defendants improperly "placed" Brenda in violation of the ADA and the Rehabilitation Act.[2]

All defendants moved for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6). Regarding the federal statutory claims, the district court interpreted the complaint as alleging improper medical treatment or medical treatment decisions and held that the ADA and Rehabilitation Act claims could not be based upon allegedly

---

[2]Regarding the federal statutory claims, Appellant alleges specifically, "The Defendants willfully, and intentionally failed to place Ms. Shelton in an environment appropriate to her needs, as required by the ADA, the Rehabilitation Act, and 28 C.F.R. § 35.130."

improper medical treatment decisions. Regarding the due process claim, the district court held that Brenda was owed no constitutional-level duty of care from any defendants because she was a voluntary patient at the Arkansas State Hospital. In the alternative, the district court held the defendants were entitled to qualified immunity based upon the absence of a violation of any clearly established rights. The district court dismissed the state-law claims without prejudice.

On appeal, Appellant has made clear that the only claims she intended to direct towards the treating physicians, Dr. Parker and Dr. Schay were state-law tort claims. Accordingly we affirm the dismissal of all federal claims against these two physicians without further comment. Appellant challenges dismissal of the claims against the other defendants, as discussed below.

II.     Discussion

A.     Section 1983 Substantive Due Process Claim

State actors in mental health facilities owe a constitutional-level duty of care to involuntarily held patients. See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 194 (1989) ("[T]he substantive component of the Fourteenth Amendment's Due Process Clause requires the State to provide involuntarily committed mental patients with such services as are necessary to ensure their 'reasonable safety' from themselves and others." (citations omitted)). Appellant concedes that state actors owe no such duty to voluntary patients. In DeShaney, the Court emphasized the need for affirmative state action restricting a person's liberty in order to justify imposing upon the state a constitutional-level duty of care. Id. at 200 ("[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and

-4-

reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.").

A patient's status at the time of admission is not necessarily dispositive, however, because a patient's status may change over time. If circumstances change post-admission, it is possible that changed circumstances in combination with duties imposed upon state actors by state law may, together, effectively change a patient's status from voluntary to involuntary. See Kennedy v. Schafer, 71 F.3d 292, 295–96 (8th Cir. 1995) (remanding to determine whether a voluntarily admitted patient had become an involuntary patient through changed circumstances in combination with a governing state statute defining state actors' duties regarding patient confinements and involuntarily commitments).

Appellant argues the rule of Kennedy, as applied to the circumstances surrounding Brenda's death, requires that we find a constitutional-level duty of care arose when defendants discovered Brenda had hanged herself in her room. According to Appellant, at that time, any reasonable state official would have concluded that Brenda posed a grave risk to herself. Appellant argues state law imposed upon some or all of the present defendants a duty to confine Brenda upon recognition of this risk. Appellant cites Arkansas statutes for the proposition that a facility administrator must detain a voluntarily admitted patient if that patient "makes a request to leave" and if "the administrator or his designee determines that the person meets the criteria for involuntary admission." Ark. Code Ann. §§ 20-47-204(2); see also Ark. Code Ann. § 20-47-210(c).

In making this argument, Appellant appears to concede that, when Dr. Parker took Brenda off of suicide watch three days prior to her hanging, Dr. Parker did not deem Brenda to be a danger to herself. By extension, other defendants were entitled to rely upon Dr. Parker's interpretation of Brenda's risk of self harm, and pursuant to the statute cited above, no administrator could have determined prior to Brenda's

-5-

hanging that she met the conditions for involuntary admission. To the extent Appellant does not concede this point, we note that it is the only reasonable inference that possibly can be drawn from the facts as alleged in the complaint.

Appellant argues the genesis of the constitutional-level duty of care is found in state law that arguably imposes upon state officials certain duties stemming from the officials' actual knowledge of Brenda's risk of self harm and determinations made about that risk of self harm. It necessarily follows that any constitutional-level duty of care (arising from changed circumstances operating in combination with these state laws) could not have existed prior to the defendants' discovery of Brenda in her room. Prior to that time, as alleged in the complaint, her treating physician made the determination that suicide watch was no longer necessary.

What Appellant is really arguing, then, is that upon the very moment that defendants discovered Brenda in her room—the precise moment at which such defendants were first aware of Brenda's need for emergency treatment—defendants had to have recognized Brenda's future risk of self-harm. According to Appellant, the Constitutional-level duty of care arose instantaneously pursuant to <u>Kennedy</u> in the midst of the unfolding medical emergency, effectively turning any potential torts surrounding the subsequent handling of Brenda's treatment into potential torts of constitutional significance.

We disagree with Appellant's proposed application of <u>Kennedy</u>. In <u>Kennedy</u>, our court did not address medical treatment decisions or failures in the context of events unfolding in the midst of an emergency. Rather, <u>Kennedy</u> involved a voluntarily admitted patient who committed suicide while on an intermediate level of suicide watch. The level of monitoring prescribed by medical professionals for the patient in <u>Kennedy</u> was based upon a medical professional's recognition of the patient's risk of self harm. By placing the patient on suicide watch, the state affirmatively deprived the patient of at least a degree of liberty. Further, in light of

the medically-identified risk of self harm, applicable state laws arguably restricted the facility administrator's ability to release the patient and placed upon the administrator a duty to investigate and involuntarily commit such a patient. See Kennedy, 71 F.3d at 295–96 (discussing Mo. Rev. Stat §§ 632.005, 632.300, & 632.155 as imposing upon state officials the potential duty to restrain involuntary patients or to investigate and involuntarily commit persons when certain conditions were met).

Against this backdrop, the alleged constitutional violation in Kennedy was related to the nurses' failures to abide by the monitoring regime applicable to the particular level of suicide watch prescribed for the patient. The allegations did not involve treatment decisions or failures after discovery of the suicide; they involved the nurses' failures that created a window of isolation during which time the patient killed herself. In fact, in Kennedy, the patient died before being discovered by nurses and, as a result, there was no post-discovery exigency and no need for emergency care or medical decisionmaking.

Over a strenuous dissent, a panel of our court held that the applicable state law defining the facility administrator's duties in combination with the facts of case required a remand for further consideration by the district court. The operative language of our holding in Kennedy was:

> We hold only that a Missouri statute may effectively restrain those in Kathleen's condition and under the care of the State from acting on their own behalf to such an extent as to trigger the protections of the Due Process Clause. It is not Kathleen's worsening medical condition alone that may have converted her status to that of an involuntary patient. Rather, her worsening condition plus the duty placed on state officials by the statute may have had this effect.

Id. at 295.

Returning to the present case, and applying <u>Kennedy</u> to the present facts, we may assume without deciding that the governing Arkansas statutes could operate like the Missouri statutes in <u>Kennedy</u> and, in limited situations, serve to convert a patient from voluntary status to involuntary status. We may also assume without deciding that the underlying facts could support a substantive due process claim in the event there existed a constitutional-level duty of care.[3] Even making these assumptions, Appellant's case fails on three independent grounds.

First, because no duty could have arisen prior to the defendants' discovery of Brenda, and because Brenda was wholly incapacitated prior to that time solely by her own actions, it is factually incorrect to assert that, after defendants found Brenda unconscious in her room, she posed some sort of additional risk of self harm. The state statutes Appellant relies upon to articulate a duty address mental-health related risks of self harm; they do not mandate the involuntary commitment of all persons found in an unconscious state. Simply put, after defendants discovered Brenda, she was no different than any unconscious patient in an emergency room, operating room, or ambulance controlled by state actors. In such circumstances various state actors owe patients state-law duties of care based upon standards for simple or professional negligence. Such circumstances, however, do not trigger duties related to involuntary commitment nor do they give rise to a constitutional-level duty of care.

Second, we are simply unwilling to extend <u>Kennedy</u> into the context of split-second, emergency-care decisionmaking as urged by Appellant. <u>Kennedy</u> was a very close case recognizing a possible exception to the affirmative-state-action requirement that <u>DeShaney</u> described as the hallmark of involuntary status. Nothing about <u>Kennedy</u> suggests its rule can be extended beyond its narrow facts. Further, we are

---

[3]Our assumption should by no means be interpreted as suggesting that, if there existed a constitutional-level duty of care, the mere failure to employ one particular emergency medical technique is the type of action that could satisfy the stringent standards applicable to a substantive due process claim.

reluctant to treat a constitutional-level duty of care as something that blinks in and out of existence in the course of an emergency based upon an analysis of state law duties unrelated to the state actors' direct response to the immediate medical emergency.

Finally, even if we were to view the present case as a potentially reasonable setting for the expansion of <u>Kennedy</u>, no such rule could have been deemed "clearly established" at the time of the events alleged in the complaint. <u>Fields v. Abbott</u>, 652 F.3d 886, 890 (8th Cir. 2011). As such, all defendants would be entitled to qualified immunity on the federal constitutional claims.

B.      Federal Statutory Claims

The district court correctly held that a claim based upon improper medical treatment decision may not be brought pursuant to either the ADA or the Rehabilitation Act. <u>See</u> <u>McElroy v. Patient Selection Comm. of Neb. Med. Center</u>, No. 07-3877, 2009 WL 50176, at *1 (8th Cir. Jan. 9, 2009) (per curiam) ("[A] medical-treatment decision, such as the one at issue here, cannot be the basis for an ADA Title III claim . . . ."); <u>Burger v. Bloomberg</u>, 418 F.3d 882, 883 (8th Cir. 2005) (per curiam) ("[A] lawsuit under the Rehab Act or the Americans with Disabilities Act (ADA) cannot be based on medical treatment decisions . . . .") (adopting the positions of <u>Schiavo ex rel. Schindler v. Schiavo</u>, 403 F.3d 1289, 1294 (11th Cir. 2005) and <u>Fitzgerald v. Corr. Corp. of Am.</u>, 403 F.3d 1134, 1144 (10th Cir. 2005)).

We have not held in the specific context of these types of federal statutory claims that a decision to remove a patient from suicide watch must be deemed a medical treatment decision. We have, however, characterized the decision as such for other purposes. <u>See</u> <u>Hott v. Hennepin Cnty., Minn.</u>, 260 F.3d 901, 905 (8th Cir. 2001) ("We have generally treated allegations that officials failed to prevent jail suicides as claims for failure to provide adequate medical treatment."); <u>Liebe v. Norton</u>, 157 F.3d 574, 577 (8th Cir. 1998) ("[O]nce one is classified as a suicide risk, the right to be

protected from that risk would seem to fall under the ambit of the right to have medical needs addressed."). Further, the allegations of the present complaint clearly state that Dr. Parker—the medical doctor under whose care Brenda was admitted to the facility—was the person who decided to remove Brenda from suicide watch. There is no allegation that the removal from suicide watch was influenced by anything other than a physician's judgment. We believe, therefore, that the physician's decision to remove Brenda from suicide watch in this case is properly characterized as a medical-treatment decision and that the district court properly dismissed the statutory claim.

Finally, we interpret some of Appellant's arguments on the statutory claims as attempting to shift the focus away from the suicide-watch determination and articulate a claim based upon infirmities with her emergency care or based upon an improper initial placement in an allegedly inappropriate facility. See supra n.2. For the same reason that the suicide-watch determination fails to support a statutory claim, however, any allegations surrounding other medical treatment following Brenda's discovery fail. We also reject Appellant's argument regarding placement in an inappropriate facility. As a voluntary patient at the Arkansas State Hospital, Brenda was not "placed"—properly or improperly—by any of the named defendants other than, arguably, Dr. Parker, who initially prescribed suicide watch and later made the medical decision to remove Brenda from suicide watch.

We affirm the judgment of the district court dismissing the federal claims with prejudice and declining to exercise jurisdiction over the state claims.

_____