# United States Court of Appeals
### For the Eighth Circuit

_____

No. 17-1198
No. 17-1393

_____

A.H., et al.

*Plaintiffs - Appellants*

v.

St. Louis County, Missouri, et al.

*Defendants - Appellees*

_____

Appeals from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: January 9, 2018
Filed: June 4, 2018

_____

Before LOKEN, BEAM, and KELLY, Circuit Judges.

_____

LOKEN, Circuit Judge.

While confined at the St. Louis County Justice Center (the Jail), Jereme Hartwig committed suicide by hanging himself with a bed sheet in his cell. Hartwig's three children and his mother (Plaintiffs) filed an action against St. Louis County; Dr. Wendy Magnoli, the Jail's clinical psychologist; corrections officer Lauren Abate;

and Herbert Bernsen, Director of the St. Louis County Department of Justice Services. Plaintiffs asserted claims of Fourteenth Amendment violations under 42 U.S.C. § 1983; wrongful death under Missouri law, Mo. Rev. Stat. § 537.080; and violations of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101, *et seq.*, and the Rehabilitation Act (RA), 29 U.S.C. §§ 701, *et seq.* The district court[1] dismissed the ADA and RA claims for lack of standing and subsequently denied Plaintiffs' untimely motion for leave to amend. Plaintiffs then filed a second action against St. Louis County, asserting the ADA and RA claims. The district court granted summary judgment dismissing Plaintiffs' Fourteenth Amendment and wrongful death claims in the first action. The district court[2] then dismissed the ADA and RA claims in the second action. Plaintiffs appeal these orders. We affirm.

## I. Background

**A.** Hartwig was arrested on a probation violation and confined at the Jail on November 1, 2012. A nurse performed the initial medical screening when Hartwig arrived; she recorded his "chief complaints" were asthma and depression, for which he had received treatment, and "patient denies suicide" and use of alcohol and drugs. The next day, a different nurse added a "Past Medical" note to Hartwig's file: "Hx of Suicide Attempt by Hanging, received treatment from St. John's [Hospital]." A week later, a third nurse examined Hartwig and reported he "denies current or past suicidal ideations or attempts."

On December 11, Hartwig saw a nurse practitioner for an asthma follow up. She reported no suicidal ideation or planning but referred him to the Jail's mental

---

[1] The Honorable Carol E. Jackson, United States District Judge for the Eastern District of Missouri, now retired.

[2] The Honorable Catherine D. Perry, United States District Judge for the Eastern District of Missouri.

health services because of his previous suicide attempt. On January 14, 2013, Hartwig saw psychiatrist Sadashiv Parwatikar. Dr. Parwatikar noted a normal affect and that Hartwig did not display or report psychotic features, was well groomed, and denied suicidal ideation, intent, or plan. Dr. Parwatikar noted Hartwig had received medication for depression when he had trouble adjusting to incarceration, had a history of substance abuse, and was facing charges for failure to pay child support.

On January 28, Hartwig was visited by Savannah Cobb, the mother of his child, who told him she was finished with their relationship. Upset, Hartwig hit himself in the head with a phone receiver, inflicting a head wound. Later that day, he told a physician's assistant who treated the injury and a nurse that he hit his head accidentally. Based on Cobb's report, staff concluded he had injured himself and confined Hartwig in the Jail's infirmary. He was "visibly upset" with infirmary confinement, said he was "just frustrated," and insisted he was "not suicidal." The following morning, he saw an infirmary nurse and signed a release for medical information from St. John's and another hospital that treated two earlier suicide episodes.[3] Hartwig asked to see a "psych," denied suicidal ideations, and said he acted out of anger at his girlfriend.

That day, Hartwig had his only contact with defendant Magnoli, a clinical psychologist working for St. Louis County. Dr. Magnoli reviewed Hartwig's medical chart and interviewed him at the infirmary. Based on the chart and the interview, Dr. Magnoli concluded Hartwig "appears to present a low risk of harm to self and others

---

[3] The St. John's Mercy Hospital records reflect that Hartwig was admitted on September 1, 2011, after attempting to hang himself in his mother's garage. His step father cut him down and he recovered with medical treatment.

A county jail has no "Eighth Amendment obligation to obtain medical records from any county hospital in which its inmates have received past medical treatment." Hott v. Hennepin Cty., 260 F.3d 901, 906 (8th Cir. 2001).

at this time." She placed him on "precautionary status" because of his prior suicide attempts, discharged him from the infirmary, and referred him to a social worker for follow up.

At that time, St. Louis County's Jail Suicide Prevention and Response Policy (the Policy), classified potentially suicidal inmates. High risk and medium risk inmates were confined in the infirmary. High risk inmates must be observed every five to ten minutes and may not have bed sheets. Medium risk inmates must be observed every fifteen minutes; they may have security blankets if they keep their heads and necks exposed. Precautionary status inmates, the lowest risk classification, were housed in the general population. They must have a cellmate, but the cellmate need not be with the precautionary status inmate at all times. Corrections officers made hourly "key tour" checks of precautionary status inmates during the first two shifts each day, and every forty minutes overnight.

After Dr. Magnoli's interview, Hartwig returned to general population and was housed with a cellmate. On February 5, defendant Abate was the corrections officer on duty in Hartwig's fifth floor housing area. She knew Hartwig was on precautionary status and had injured himself with the phone receiver. She conducted the hourly checks required by the Policy. Abate observed Hartwig making a phone call and at dinner. During the 7:25 p.m. check, inmates were permitted to be out of their cells for "day room" time. In her deposition, Abate did not "specifically recall noticing" Hartwig during her checks; a subsequent affidavit averred that she noted Hartwig alone in his cell during the 7:25 p.m. check. About fifty minutes later, Abate unlocked Hartwig's cell to let his cellmate enter. The cellmate told Abate that Hartwig was hanging in the cell. Abate radioed for assistance, jail staff attempted to revive Hartwig, and he was transported to the hospital, where he died six days later.

As Director of the St. Louis County Department of Justice Services, defendant Bernsen oversaw the operations of the Jail. In the five years prior to Hartwig's

suicide, there had been two suicides in which inmates in a segregation area hung themselves with bed sheets. Neither had been identified as suicidal or placed on suicide precaution. In response, the Jail made physical modifications to the eighth floor segregation area and the infirmary to eliminate bed sheet "anchors" those inmates used for their suicides. Hartwig was the first inmate on precautionary status to commit suicide since the Jail opened in 1998. After his suicide, the Policy was twice amended to prohibit leaving precautionary status inmates alone in their cells, and to house them in cells close to the work station of a corrections officer.

**B.** Plaintiffs filed the first action in December 2014. The district court dismissed the ADA and RA claims in July 2015 because Plaintiffs did not sue on behalf of Hartwig's estate. They filed a First Amended Complaint in November 2015 on the last day to amend without leave under the court's case management order. They re-alleged ADA and RA violations by St. Louis County, falsely alleging they were "concurrently filing in Missouri state court a Petition for Determination of Heirship." In December 2015, the district court dismissed the ADA and RA claims because Plaintiffs had not been determined to be the heirs to Hartwig's estate. In January 2016, Plaintiffs filed an heirship petition, which the probate court granted in April 2016. Plaintiffs then filed a motion for leave to file a Second Amended Complaint re-alleging the ADA and RA claims. The district court denied the motion, concluding that Plaintiffs could not show good cause because they had not been diligent in meeting case management order deadlines, and that allowing the amendment would prejudice the defendants.

Plaintiffs then filed the second action asserting the same ADA and RA claims. St. Louis County moved to dismiss, arguing Plaintiffs impermissibly split their causes of action and the complaint failed to state a claim. The district court stayed the action pending the outcome of the first case. In January 2017, the district court granted defendants summary judgment in the first case. The court then granted the County's

motion and dismissed the ADA and RA claims in the second case "for the reasons set out in the motion and supporting memoranda." These consolidated appeals followed.

## II. Constitutional Claims under § 1983

Plaintiffs allege the individual defendants and St. Louis County violated the Fourteenth Amendment rights of Hartwig, a pretrial detainee, when they failed to protect him from a known risk of harm, that he presented a substantial risk of suicide. "[T]he Eighth Amendment prohibition on cruel and unusual punishment extends to protect prisoners from deliberate indifference to serious medical needs," including the risk of suicide. Gregoire v. Class, 236 F.3d 413, 417 (8th Cir. 2000). Deliberate indifference is "akin to criminal recklessness," something more than mere negligence; a plaintiff must show that a prison official "actually knew that the inmate faced a substantial risk of serious harm" and did not respond reasonably to that risk. Drake ex rel. Cotton v. Koss, 445 F.3d 1038, 1042 (8th Cir. 2006); see Farmer v. Brennan, 511 U.S. 825, 836-37, 844-45 (1994). "[P]retrial detainees are entitled to at least as great protection as that afforded convicted prisoners under the Eighth Amendment." Luckert v. Dodge Cty., 684 F.3d 808, 817 (8th Cir. 2012) (quotation omitted), cert. denied, 568 U.S. 1089 (2013).

The district court ruled (i) that Plaintiffs failed to show that any defendant was deliberately indifferent to a substantial risk that Hartwig would commit suicide, and (ii) that the individual defendants were entitled to qualified immunity, which protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Plaintiffs challenge both conclusions on appeal. We review a district court's grant of summary judgment *de novo*, viewing the evidence in the light most favorable to the nonmoving party. Koss, 445 F.3d at 1042.

As we agree with the district court that Plaintiffs failed to prove a violation of Hartwig's Fourteenth Amendment rights, we need not address qualified immunity.

**A. Clinical Psychologist Magnoli.** Plaintiffs argue Dr. Magnoli was deliberately indifferent to the known risk of suicide when she placed Hartwig on precautionary status and discharged him from the infirmary. Dr. Magnoli knew from her interview and review of Hartwig's medical chart that he had several "historical" and "situational" risk factors for suicide -- a previous suicide attempt, history of drug use and depression, financial and legal problems, and a relationship strain that led to self-injury with the telephone receiver. She knew Hartwig lied to Jail staff in denying a past suicide attempt and the self-inflicted injury, and that inmates commonly lied to avoid being placed in the infirmary.

Dr. Magnoli testified that Hartwig denied suicidal ideation during the interview, did not present any outward signs of depression, and lacked indicators of suicide risk such as psychotic behavior, poor grooming, or lack of alertness or eye contact. Hartwig's chart also recorded that he had denied suicide ideations or plans to multiple medical professionals. Taking Hartwig's risk factors into account, Magnoli determined that he presented a low risk of harm to himself but that his prior suicide attempt warranted placing him on precautionary status and referring him to a social worker for follow up. This exercise of professional judgment, even if negligent, falls well short of deliberate indifference. See Luckert, 684 F.3d at 818-19; Minix v. Canarecci, 597 F.3d 824, 833 (7th Cir. 2010). "[W]here suicidal tendencies are discovered and preventive measures taken, the question is only whether the measures taken were so inadequate as to be deliberately indifferent to the risk. The suicide is not probative of that question." Rellergert v. Cape Girardeau Cty., 924 F.2d 794, 796 (8th Cir. 1991).

**B. Corrections Officer Abate.** Plaintiffs argue corrections officer Abate was deliberately indifferent to Hartwig's risk of suicide because she knew he had been

placed on precautionary status and had injured himself with the telephone receiver but "completely failed to monitor Hartwig." The district court ruled that Abate was entitled to judgment as a matter of law because "[t]he evidence establishes that Abate conducted hourly checks on inmates, including Mr. Hartwig, as required by the jail's suicide prevention policy." On appeal, Plaintiffs only challenge to this ruling is to note that Abate testified she did not "specifically recall noticing" Hartwig in his cell during the hourly checks and did not speak to Hartwig on the day he committed suicide. Abate's failure to recall the details of her monitoring at a deposition three years later does not create a genuine issue that she failed to conduct the hourly monitoring, much less that she was deliberately indifferent to Hartwig's risk of suicide. See Yellow Horse v. Pennington Cty., 225 F.3d 923, 927-28 (8th Cir. 2000). Deliberate indifference requires proof of criminal recklessness.

**C. Director Bernsen and St. Louis County.** Director Bernsen had no personal involvement with any decision relating to detainee Hartwig, but he was the Jail's final policymaker. In an action under § 1983, a municipality such as St. Louis County and its supervisor cannot be liable on a respondeat superior theory, but can be held liable if a constitutional violation resulted from a municipal policy or custom. See Liebe v. Norton, 157 F.3d 574, 578-79 (8th Cir. 1998). That liability attaches in two situations, where a municipal policy is itself unconstitutional, and where the municipality's deliberate indifference to the need to train and supervise its employees causes an employee to violate a third party's constitutional rights. See City of Canton v. Harris, 489 U.S. 378, 386-90 (1989).

Failure to train claims are more common, and Plaintiffs argue on appeal that Bernsen and the County should be liable for failure to train and supervise the Jail's staff. But that claim fails because we agree with the district court that no County employee was guilty of violating Hartwig's constitutional rights. See Gibson v. Cook, 764 F.3d 810, 817 (8th Cir. 2014). Thus, the issues remaining on appeal are whether the Policy itself violated Hartwig's constitutional right to be protected from

suicide and, if so, whether Bernsen was personally involved in that unconstitutional policymaking. See Webb v. City of Maplewood, 889 F.3d 483 (8th Cir. 2018). The Supreme Court has provided the standard under which these claims must be reviewed:

> Where a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving . . . issues of fault and causation is straightforward. Section 1983 itself contains no state-of-mind requirement independent of that necessary to state a violation of the underlying federal right. In any § 1983 suit, however, the plaintiff must establish the state of mind required to prove the underlying violation.

Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 404-05 (1997). Here, Plaintiffs must show that the Policy itself reflects deliberate indifference of the County and Bernsen to the risk of inmate or detainee suicide that was the "moving force" behind the violation of Hartwig's rights. Luckert, 684 F.3d at 820; see Jenkins v. Cty. of Hennepin, 557 F.3d 628, 633-34 (8th Cir. 2009).

At the time of Hartwig's suicide, the Policy required incoming inmates to be screened for suicidal ideations, plans, and behavior. It classified inmates into different risk tiers and mandated successively more stringent precautions for each tier. Inmates on precautionary status were required to be housed with a cellmate, were to have their status evaluated at least every three weeks by a member of the mental health team, and were to be moved to the jail infirmary if required to be transferred out of regular housing for disciplinary reasons. The Policy detailed extensive procedures for handling potentially suicidal detainees and mandated annual employee training. In response to two prior suicides, the Jail removed shelves and modified vents in the segregation area and infirmary that the inmates had used as anchors.

Pointing to the two previous suicides in the segregation area and twenty-two attempted suicides between May 2008 and February 2013, Plaintiffs argue St. Louis County was deliberately indifferent because the Policy allowed inmates on precautionary status to be alone in their cells, permitted them to have bed sheets, and did not require them to be monitored more than the inmate population at large when in general housing. Prior cases foreclose this line of attack. A municipal policy "cannot be both an effort to prevent suicides and, at the same time, deliberately indifferent to suicides." Liebe, 157 F.3d at 579; see Rellergert, 924 F.2d at 797 ("Indifference is apathy or unconcern. The policy demonstrates the opposite . . . concern that inmates not commit suicide."); Yellow Horse, 225 F.3d at 928-29. As the district court noted, attempted suicides are not evidence of deliberate indifference. If anything, they show the Policy was effective in avoiding the unfortunate reality of inmate or detainee suicide.

For these reasons, we conclude the district court properly granted all defendants summary judgment dismissing Plaintiffs' § 1983 claims.

### III. Missouri Wrongful Death Claim

The court determined the wrongful death claims are barred by sovereign immunity with respect to St. Louis County and by official immunity with respect to the individual defendants, except to the extent that corrections officer Abate non-negligently performed a ministerial duty in monitoring Hartwig. Under Missouri law, absent bad faith or malice, which requires proof of intent to injure, public officials are entitled to official immunity from suit for discretionary acts or omissions undertaken within the scope of their authority, but can be held liable "for torts committed when acting in a ministerial capacity." State ex rel. Twiehaus v. Adolf, 706 S.W.2d 443, 444, 446-47 (Mo. 1986) (quotation omitted). On appeal, Plaintiffs argue the district court erred in granting summary judgment in favor of Abate because there was

sufficient evidence she was negligent in checking Hartwig's cell on her hourly rounds. We review this issue *de novo*. Koss, 445 F.3d at 1042.

Defendants concede that Abate acted in a ministerial capacity in monitoring Hartwig, a precautionary status inmate, in accordance with the Policy's cell check requirements. The Policy required performance of checks "upon a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to [her] own judgment or opinion concerning the propriety of the act to be performed." Southers v. City of Farmington, 263 S.W.3d 603, 610 (Mo. 2008) (quotation omitted). Abate can be liable if she negligently breached this ministerial duty. See Adolf, 706 S.W.2d at 445; Stephens v. Dunn, 453 S.W.3d 241, 250 (Mo. App. 2014). Based on deposition testimony that Abate did not "specifically recall noticing" Hartwig when she conducted her cell checks, Plaintiffs argue Abate negligently "glanced" in the cells rather than "checking" them. But Plaintiffs do not dispute that Abate performed her ministerial duty of conducting hourly checks required by the Policy. At the last check before Hartwig hung himself, Abate noted he was in his cell at a time when many other inmates, including Hartwig's cellmate, were not. Whether Abate should have taken action because of that circumstance required an exercise of her discretion that is shielded by official immunity.

### IV. ADA and RA Claims

Plaintiffs argue the district court erred in denying leave to file a second amended complaint updating their ADA and RA claims in the first action and in dismissing these claims in the second action. We first address the dismissal of these claims on the merits. Like the district court, we conclude Plaintiffs' ADA and RA allegations failed to state a claim.

Improper medical treatment claims may not be brought under the ADA or RA. See Shelton v. Ark. Dep't of Human Servs., 677 F.3d 837, 843 (8th Cir. 2012);

-11-

Burger v. Bloomberg, 418 F.3d 882, 883 (8th Cir. 2005). "We have generally treated allegations that officials failed to prevent jail suicides as claims for failure to provide adequate medical treatment." Hott, 260 F.3d at 905. Plaintiffs contend their complaint alleges discrimination "based on social, educational, recreational, religious and safety accommodations, not medical treatment decisions." But the complaint alleges Hartwig could have enjoyed various benefits of jail life but for "a lack of treatment and adequate supervision" and states he was not given appropriate medication, protection from hazards, and security monitoring that would have prevented him from committing suicide. These allegations are, in essence, claims of inadequate medical treatment indistinguishable from the claims we held could not be brought under the ADA or RA in Shelton, 677 F.3d at 839 n.2, 843. The district court properly dismissed the complaint in the second action.

The district court's denial of leave to amend in the first action is reviewed for abuse of discretion. United States ex rel. Roop v. Hypoguard USA, Inc., 559 F.3d 818, 822 (8th Cir. 2009). Plaintiffs' motion was filed in April 2016, months after the November 2015 deadline in the district court's case management order. Therefore, good cause was required to excuse non-compliance. See Fed. R. Civ. P. 16(b); Sherman v. Winco Fireworks, Inc., 532 F.3d 709, 714-16 (8th Cir. 2008). Plaintiffs attack the district court's conclusions that Plaintiffs were not diligent and defendants would be prejudiced by untimely addition of ADA and RA claims. We conclude we need not address these issues. The ADA and RA claims in Plaintiffs' proposed Second Amended Complaint are identical to the claims they asserted in the second action. We have affirmed dismissal of the second action on the merits. Thus, adding these claims to the first action would have been futile. Futility is always a basis to deny leave to file an amended complaint. See, e.g., Roop, 559 F.3d at 824.

The judgments of the district court are affirmed.

_____

-12-