RILEY, Chief Judge.
Troy Sampson committed suicide while detained at the Dodge County Jail (DCJ) in Fremont, Nebraska. Sampson’s mother, Sherry Luckert, acting as the personal representative of Sampson’s estate, sued Dodge County and jail officials under 42 U.S.C. § 1983, claiming they were deliberately indifferent to Sampson’s medical needs, violating his due process rights. A jury found Dodge County and DCJ’s director and nurse (collectively, appellants) liable and awarded Luckert actual and punitive damages. The district court denied the appellants’ motion for judgment as a matter of law, entered judgment in favor of Luckert, and awarded her attorney fees and costs. We reverse the denial of judgment as a matter of law and vacate the awards of damages and attorney fees and costs for Luckert.
I. BACKGROUND
A. Facts[1]
1. Dodge County Jail
On August 10, 2006, Troy Sampson committed suicide in his DCJ cell. DCJ, which is now closed, held up to 42 inmates, all of whom either had not yet been convicted of a crime or who were serving a sentence of less than one year. Sampson was the third DCJ inmate to commit suicide and the twenty-first attempting to commit suicide since 2000.
Appellant Doug Campbell, appointed in 1995, was the director of DCJ at the time of Sampson’s suicide. Among other responsibilities, Campbell was in charge of training and scheduling staff and making sure the staff followed DCJ’s policies.
To provide for the inmates’ medical needs, DCJ contracted with local physicians, including Dr. Mohammad Shoaib, a Fremont area psychiatrist. DCJ also employed a nurse, who, according to Campbell, served as the gatekeeper between the inmates and the doctors. The nurse coordinated the inmates’ medical care, ensured inmates received prescribed medications, and directed the jail staff concerning medical and suicide watches. In July 2006, approximately one month before Sampson was detained there, DCJ hired appellant Cynthia Julian, a registered nurse since 1996, to be DCJ’s full-time permanent nurse.
At the time of Sampson’s suicide, Dodge County’s Corrections Policy & Procedure Manual included a written Suicide Intervention Policy (Policy 12.4). Implemented in December 1994, Policy 12.4 had not been revised before Sampson’s suicide. At trial, Campbell and Julian acknowledged DCJ did not follow aspects of Policy 12.4, including its identification of three suicide levels: (1) Alert, which required close observation of the inmate and placement in the safety cell; (2) Warning, which required visual checks of the inmate in intervals no longer than ten minutes (ten-minute watch); and (3) Watch, which required visual checks of the inmate in intervals no longer than twenty minutes (twenty-minute watch).
Campbell testified DCJ instructed employees about Policy 12.4 during orientation, but certain provisions of the policy, such as keeping a suicide notebook and *813 recording daily assessments, were not followed. Julian had not yet gone through new employee orientation, or any formal suicide training, at the time of Sampson’s suicide. Julian testified she could not remember whether she knew of Policy 12.4 at that time. Julian also testified DCJ’s practice was to put inmates displaying suicidal tendencies on either a fifteen-, twenty-, or thirty-minute watch.
2. Sampson’s Detention at DCJ
When DCJ admitted Sampson on Sunday, July 30, 2006, Sampson answered no when asked if he had ever attempted suicide or was thinking about committing suicide. Luckert called DCJ and reported Sampson had attempted suicide two weeks earlier by trying to hang himself. DCJ also learned Sampson was on anti-psychotic medication. In light of this information, and because Sampson seemed mentally unstable, DCJ kept Sampson in the booking area overnight and put him on a twenty-minute suicide watch.
Julian met with Sampson the next day. Julian noted Sampson complained of post-traumatic distress disorder, depression, anxiety attacks, and psychosis. Julian observed Sampson was “very anxious,” “tearful,” and had “flight of ideas,” meaning he changed topics often. Julian testified Sampson denied he was suicidal, and Julian did not believe Sampson was a danger to himself or others.
That same day, Julian contacted Sampson’s psychiatrist, Dr. Stephen O’Neill, who worked at the Norfolk Regional Center. Julian’s notes indicate Dr. O’Neill saw Sampson about a week prior and had prescribed Klonopin and Cymbalta for Sampson. Dr. O’Neill advised DCJ to put Sampson on suicide watch until he was “medically/psychologically stable [and] back on [medication].” Julian kept Sampson on suicide watch, but downgraded it from a twenty-minute watch to a thirty-minute watch. Sampson officially remained on a thirty-minute suicide watch until he committed suicide. DCJ records indicate jail staff missed multiple watches during Sampson’s detention.[2] Throughout Julian’s work day, she periodically observed Sampson.
On July 31, Julian faxed information concerning Sampson to DCJ’s contract psychiatrist, Dr. Shoaib. Julian advised Dr. Shoaib of Sampson’s current medications and “long psychiatric history from the Norfolk Regional Center.”[3] Julian received and reviewed Sampson’s medical records from the Norfolk Regional Center and advised Dr. Shoaib she had requested that the Norfolk Regional Center forward Sampson’s medical history to him. Julian requested Dr. Shoaib review the material *814 and advise her what medications Sampson should take and “what you feel would be best for this patient.”
On Tuesday, August 1, Dr. O’Neill prescribed medications for Sampson. That same day, at Julian’s direction, DCJ moved Sampson out of the holding area and into its general population. Julian testified she did so in part because she “didn’t want him laying on the concrete floor,” and because she “wanted him in general population to be around other people.” DCJ moved Sampson to a different cell on August 3 and again on August 5. At least one of these moves appears to be at Sampson’s request.
Dr. Shoaib saw Sampson on Thursday, August 3. Dr. Shoaib testified Sampson “was very, very anxious, very agitated, psychotic” and “bizarre and unpredictable.” Dr. Shoaib said that Sampson denied being suicidal, but Dr. Shoaib recommended DCJ “keep [Sampson] on suicide watch until his behaviors settle[d] down and he became less agitated.” Indicating Sampson was not suicidal or homicidal, Dr. Shoaib changed Sampson’s prescriptions.
Julian next saw Sampson on Monday, August 7, in response to two Requests for Medical Care Sampson made on August 3 and August 6.[4] Julian testified she did not see Sampson’s written requests until August 7, when she returned to the office from a weekend off. Julian testified Sampson appeared “kind of glassy-eyed, foggy, [and] overmedicated.” Julian advised Sampson he was taking the medications Dr. Shoaib prescribed and that it would take one or two weeks before the side effects disappeared. That same day, Julian contacted Dr. Shoaib and reported her observations of Sampson. Dr. Shoaib ordered a reduction in the dosage of Sampson’s medication.
At trial, Luckert’s counsel confronted Julian with Sampson’s Medication Administration Record, which Julian had filled out, as well as the prescription orders from Dr. Shoaib. Though not entirely clear from these documents, it appears Julian failed to ensure Sampson was medicated in compliance with Dr. Shoaib’s orders. As a result, it was reasonable for the jury to infer (1) DCJ gave Sampson higher than prescribed doses of Risperidone (an anti-psychotic drug) and Klonopin (an anti-anxiety drug) from August 7 to August 10, and (2) failed to give Sampson Lunesta (a sleeping aid) as prescribed for the entirety of his detention. Other documents demonstrate DCJ failed to give Sampson one dose of Klonopin on August 1.
Later on August 7, Sampson submitted another Request for Medical Care and two Inmate Request forms. In all three requests, Sampson again asked DCJ to move him to the safety cell or solitary confinement and stressed he wanted to be alone and did not want a window or a television in his cell. The safety cell was a special cell that was designed to be suicide resistant. Julian replied to Sampson’s requests the next day, telling him DCJ did not have such a cell available. Another staff member responded by writing, “The Safety Cell cannot be used at this time. When something opens up we will try and move you.” *815 Campbell and Julian both testified the safety cell was not available because another inmate had broken its glass window on August 3 and it had not yet been repaired.
On Tuesday, August 8, a DCJ official transported Sampson to his bond hearing, during which Sampson told the judge, “I’ve been trying to get into the Norfolk Regional Center before this happened, and they were full, and then I went every recourse to try and get help, and it seems like every door was shut in my face.” Later that day, Luckert visited Sampson at DCJ. Luckert testified Sampson was tearful and erratic. Luckert claimed before she left DCJ, she told a DCJ employee Sampson was “definitely suicidal” and DCJ employees needed to watch him. That same day, Sampson filled out another Request for Medical Care asking to see Dr. Shoaib on Thursday. Julian responded to Sampson’s request the next day, telling Sampson he had an appointment scheduled for Thursday, August 10.
On Thursday morning, August 10, Dr. Shoaib met with Sampson again and evaluated Sampson’s condition. Dr. Shoaib observed Sampson had “calmed down” since his last visit. Dr. Shoaib testified he asked Sampson if he was suicidal. According to Dr. Shoaib, Sampson responded, “No Doc, it’s not that. I want to go to Norfolk Regional Center. I do not belong [at DCJ]. I am not a criminal. I have a mental problem and I have to be in Norfolk Regional Center.” Dr. Shoaib testified he discussed various options with Sampson, including telling him that “if you are suicidal I can send you to the hospital, you can be [in Emergency Protective Custody] and then from there the hospital mental health board can commit you to the Norfolk Regional Center.” According to Dr. Shoaib, Sampson again denied suicidal thoughts. Dr. Shoaib testified he did not believe Sampson was suicidal at that time — August 10. Dr. Shoaib adjusted Sampson’s prescription and asked that Sampson schedule another appointment in two weeks.
Later that afternoon, Sampson attended a bible study. According to the testimony of the volunteer study leader, another inmate asked whether a person who committed suicide could still go to heaven. The leader testified that during the resulting discussion, Sampson said everyone had thought about suicide at least once during their life. The leader was not concerned about Sampson’s statement and did not report the conversation to DCJ officials.
At approximately 4:35 p.m. on August 10, staff discovered “Sampson hanging by a bed sheet from the vent above the toilet.” Attempts to revive Sampson were unsuccessful and he was pronounced dead.
As required by Nebraska law, see Neb. Rev.Stat. § 29-1401(4), a grand jury investigated Sampson’s death. The grand jury urged the Dodge County Board of Supervisors to “review their policies and procedures, particularly in dealing with medical watch inmates.” The grand jury called “for change in the style or type of venting cover in individual cells” and made general recommendations, including (1) the use of “cameras and other surveillance during these intensified suicide watch periods”; (2) “more staffing” as a general deterrence; (3) increased training for staff, “particularly in response to medical watch inmates”; and (4) modification of the suicide watch forms. The grand jury also expressed concerns about “the entire management of [DCJ], top to bottom” and the “workload of the jail nurse.”
B. Prior Proceedings
On April 23, 2007, Luckert filed a 42 U.S.C. § 1983 civil rights claim against the appellants. As relevant to this appeal, *816 Luckert alleged Sampson’s due process rights arising from the Eighth and Fourteenth Amendments were violated by (1) the appellants’ deliberate indifference to Sampson’s serious medical needs; (2) Dodge County’s custom or policy of failing to implement reasonable suicide prevention practices; and (3) Dodge County’s failure to train its employees to observe and act upon signs of a risk of suicide among its detainees (failure to train claim).
The appellants moved for summary judgment, arguing they were entitled to qualified immunity because Luckert- could not show they were deliberately indifferent to the risk Sampson would commit suicide. The district court denied the appellants’ motion, finding the appellants were not entitled to qualified immunity because there were factual questions for the jury to determine.
The district court presided over a six-day trial in June 2010. At the close of Luckert’s case, the appellants moved for judgment as a matter of law. See Fed.R.Civ.P. 50(a). The district court denied the motion.
On June 28, 2010, the jury returned a verdict in favor of Luckert and against all of the appellants. The jury found both Julian and Campbell were deliberately indifferent to Sampson’s serious medical needs. The jury found Dodge County was liable “for a policy or custom of failing to implement reasonable suicide prevention practices,” but found in favor of Dodge County on Luckert’s failure to train claim. The jury awarded Luckert $750,000 in compensatory damages and $100,000 in punitive damages — $75,000 against Campbell and $25,000 against Julian.
On July 26, 2010, the appellants renewed their motion for judgment as a matter of law pursuant to Rule 50(b), arguing “[t]he evidence adduced at trial is insufficient to sustain the verdict by the jury that ... Dodge County, through its policy, violated Sampson’s constitutional rights” and “Campbell and Julian are entitled to qualified immunity” as a matter of law. In the alternative, the appellants moved for a new trial or to alter or amend the judgment. See Fed.R.Civ.P. 59(a) and (e).
On November 10, 2010, the district court denied the appellants’ motion, finding the evidence fully supported the “jury’s finding of deliberate indifference to serious medical needs,” as well as the compensatory and punitive damage awards. The district court entered judgment consistent with the jury verdict. On November 18, the district court awarded Luckert attorney fees and costs. See 42 U.S.C. § 1988(b). On December 7, 2010, the appellants filed timely notice of appeal.
II. DISCUSSION
On appeal, the appellants contend the district court committed reversible error by (1) denying their motion for judgment as a matter of law; (2) not issuing a remittitur or striking punitive damages; (3) omitting proposed jury instructions; (4) permitting certain expert testimony; (5) allowing improper conduct by Luckert’s attorney; and (6) awarding Luckert attorney fees and costs.
A. Judgment as a Matter of Law
The appellants challenge the district court’s denial of their motion for judgment as a matter of law, claiming Julian and Campbell are entitled to qualified immunity and there was insufficient evidence to show Dodge County’s practices or policies violated Sampson’s due process rights.
We review the district court’s denial of a motion for judgment as a matter of law de novo, “using the same standards as the district court.” Howard v. Mo. Bone & Joint Ctr., Inc., 615 F.3d 991, 995 *817 (8th Cir.2010). A motion for judgment as a matter of law is proper only if “a reasonable jury would not have a legally sufficient evidentiary basis to find for [Luckert].” Fed.R.Civ.P. 50(a). Our review is highly deferential to the jury verdict and we do not weigh the evidence or question witnesses’ credibility in reaching our conclusion. See Howard, 615 F.3d at 995.
“[T]he Eighth Amendment prohibition on cruel and unusual punishment extends to protect prisoners from deliberate indifference to serious medical needs.” Vaughn v. Greene Cnty., Ark., 438 F.3d 845, 850 (8th Cir.2006). “[A] risk of suicide by an inmate is a serious medical need.” Gregoire v. Class, 236 F.3d 413, 417 (8th Cir.2000). “Because [Sampson] was a pretrial detainee, [his] claims are analyzed under the Fourteenth Amendment’s Due Process Clause rather than the Eighth Amendment.” Vaughn, 438 F.3d at 850. “Under the Fourteenth Amendment, pretrial detainees are entitled to at least as great protection as that afforded convicted prisoners under the Eighth Amendment.” Id. (quoting Owens v. Scott Cnty. Jail, 328 F.3d 1026, 1027 (8th Cir.2003) (per curiam) (internal quotation marks omitted)). In short, Sampson “had a clearly established constitutional right to be protected from the known risks of suicide and to have his serious medical needs attended to.” Yellow Horse v. Pennington Cnty., 225 F.3d 923, 927 (8th Cir.2000).
1. Qualified Immunity
 Our first task is to decide whether Julian and Campbell are entitled to qualified immunity. Qualified immunity is a legal question for the court, not the jury, to decide in the first instance, based either on the allegations or, if material facts are in dispute, on the facts found by the jury. See Littrell v. Franklin, 388 F.3d 578, 584-85 (8th Cir.2004) (explaining “[t]he law of our circuit is clear .... [that] qualified immunity is a question of law for the court, rather than the jury, to decide”). Whether the official’s conduct constitutes deliberate indifference is a question of fact for the jury. See Davis v. Hall, 375 F.3d 703, 719 (8th Cir.2004).
Qualified immunity shields government officials performing discretionary functions from civil liability unless their conduct “violatefs] clearly established statutory or constitutional rights of which a reasonable person would have known.” Ambrose v. Young, 474 F.3d 1070, 1077 (8th Cir.2007) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (internal quotation marks omitted)). “Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.” Id. (quoting Davis, 375 F.3d at 712 (internal quotation marks omitted)). Qualified immunity “provides ample protection to all but the plainly incompetent or those who knowingly violate the law.” Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).
In the jail suicide context, qualified immunity is appropriate when a plaintiff “has failed to show ... that his jailers have acted in deliberate indifference to the risk of his suicide.” Rellergert v. Cape Girardeau Cnty., Mo., 924 F.2d 794, 796 (8th Cir.1991). “[P]rison supervisors such as [Campbell] cannot be held liable under § 1983 on a theory of respondeat superior.” Langford v. Norris, 614 F.3d 445, 460 (8th Cir.2010). “Supervisors can, however, ‘incur liability ... for their personal involvement in a constitutional violation, or when their corrective inaction amounts to deliberate indifference to or tacit authorization of the violative practices.’ ” Id. (quoting Choate v. Lockhart, 7 F.3d 1370, 1376 (8th Cir.1993)).
*818 Because Julian and Campbell were aware of a report Sampson recently had attempted suicide, the dispositive question is “whether the measures taken were so inadequate as to be deliberately indifferent to the risk.” Rellergert, 924 F.2d at 796. “The suicide [itself] is not probative of that question” because “tying the suicide to proof of deliberate indifference is tantamount to requiring jailers to provide suicide-proof institutions,” and to ensure against suicide ever happening. Id. This is not the constitutional test. Instead, we must objectively “consider[ ] the measures taken in light of the practical limitations on jailers to prevent inmate suicides.” Id. “Simply laying blame or fault and pointing out what might have been done is insufficient. The question is not whether the jailers did all they could have, but whether they did all the Constitution requires.”[5] Id. at 797. “In evaluating an official’s response to a known suicide risk, we should be cognizant of how serious the official knows the risk to be.” Gregoire, 236 F.3d at 418.
An objective review of the evidence that is deferential to the verdict reveals the preventative measures taken by DCJ were not so inadequate as to constitute constitutional deliberate indifference. Sampson was detained at DCJ for fewer than twelve days, At no point during Sampson’s incarceration before his successful suicide on August 10 did Sampson attempt suicide or claim to be suicidal. DCJ learned from Luckert that Sampson recently attempted suicide. In response, Julian, a registered nurse, twice saw and assessed Sampson and arranged for two appointments with DCJ’s psychiatrist, Dr. Shoaib, including a session on the morning of Sampson’s suicide. Julian also contacted Sampson’s psychiatrist, Dr. O’Neill, to gather information about Sampson’s condition. Julian received and reviewed Sampson’s Norfolk Regional Center medical records and Dr. O’Neill’s written synopsis report on Sampson. Julian responded in writing to each of Sampson’s Requests for Medical Care and called Dr. Shoaib when she observed Sampson might be over-medicated. Despite the fact neither Julian nor Dr. Shoaib believed Sampson posed a serious risk to himself or others, DCJ kept Sampson on a thirty-minute suicide watch for the entirety of his detention. Even though Julian and Dr. Shoaib both were mistaken as to the risk of suicide, Julian’s actions do not indicate Julian was apathetic or unconcerned with Sampson’s condition. See Rellergert, 924 F.2d at 797 (“Indifference is apathy or unconcern.”).
Construing the evidence in favor of the verdict, a reasonable jury could conclude Julian (1) negligently downgraded Sampson from a twenty-minute to a thirty-minute suicide watch; (2) failed to recognize or chose to ignore missed watches, although no missed watches occurred in the last four days of Sampson’s detention; (3) failed to give Sampson one dose of prescribed medicine nine days before Sampson’s suicide; (4) failed to act quickly or adequately upon Sampson’s requests for a new cell, which was not readily available; (5) failed to implement a reduction in Sampson’s prescribed medicine; and (6) failed to tell Dr. Shoaib about Luckert’s report that Sampson had attempted suicide two weeks before his detention. While these failures may constitute poor judgment, negligence, or possibly even *819 gross negligence, they do not constitute deliberate indifference when viewed in the context of the “affirmative, deliberative steps” Julian took to prevent Sampson’s suicide. See Liebe, 157 F.Sd at 578; see also Drake v. Koss, 445 F.3d 1038, 1042 (8th Cir.2006) (“Deliberate indifference is akin to criminal recklessness and requires something more than mere negligent misconduct.”); Gibson v. Weber; 433 F.3d 642, 646 (8th Cir.2006) (“A showing of deliberate indifference is greater than gross negligence.”); Choate, 7 F.3d at 1374 (explaining “deliberate indifference requires a highly culpable state of mind approaching actual intent”); see also Minix v. Canarecci, 597 F.3d 824, 828-29, 833 (7th Cir.2010) (concluding a nurse’s decision to remove a pretrial detainee from a suicide watch and from medical segregation despite knowing the inmate had twice attempted suicide, once in the previous month, did not show deliberate indifference, even if the decision showed poor judgment); but cf. Miller v. Tobiasz, 680 F.3d 984, 987-88, 989-91 (7th Cir.2012) (affirming, on interlocutory review, the district court’s denial of a prison nurse’s qualified-immunity-based motion to dismiss because the nurse’s omission of information relating to an inmate’s previous suicidal behavior on his jail intake form could constitute deliberate indifference). Julian is entitled to qualified immunity.
As to Campbell, the evidence does not paint an impressive picture of his performance as DCJ director. Campbell delegated to Julian significant responsibility for suicide intervention before DCJ formally trained her on relevant suicide policies and procedures. Further, DCJ’s actual practice in dealing with suicide intervention, for which Campbell was ultimately responsible, did not reflect DCJ’s written policy. DCJ allowed for a thirty-minute suicide watch, which provided less frequent observation than the watches detailed in Policy 12.4. Also, DCJ did not keep a “suicide notebook,” or maintain certain documentation procedures referenced in Policy 12.4. It would be reasonable to expect Policy 12.4 either to be followed or be modified to reflect DCJ’s actual practices. But these acts and omissions do not rise to the level of constitutional deliberate indifference.
Failure to follow written procedures does not constitute per se deliberate indifference. If this were so, such a rule would create an incentive for jails to keep their policies vague, or not formalize policies at all. And the record in this case does not show any evidence, nor are we aware of any precedent, from which jail officials would know a thirty-minute suicide watch — as opposed to a twenty-minute watch — is constitutionally impermissible, or that keeping a suicide notebook is constitutionally required. See generally Rellergert, 924 F.2d at 797 (“While we conclude that the law is clearly established that jailers must take measures to prevent inmate suicides once they know of the suicide risk, we cannot say that the law is established with any clarity as to what those measures must be.”).
Under Campbell’s management, DCJ had in place a practice where inmates at risk of committing suicide were identified, put on suicide watch, and given on-site medical attention by a registered nurse and, if necessary, a contract psychiatrist. See id. at 834 (recognizing that evidence casting doubt on a supervisor’s performance did “not support an inference [the supervisor] condoned any unconstitutional practice by ... employees”). As a result, Sampson remained on suicide watch throughout his detention and received medical attention from Julian and Dr. Shoaib, including on the same day as his suicide. Campbell is entitled to qualified immunity. See Gregoire, 236 F.3d at 418 *820 (“Even if an official knows of a risk of suicide, and suicide does occur, the official is entitled to qualified immunity if he could reasonably believe that his response to the risk was not deliberately indifferent (or reckless) to that risk.”).
2. Dodge County Liability
Finally, we must consider whether Dodge County is entitled to judgment as a matter of law. “A claim against a county is sustainable only where a constitutional violation has been committed pursuant to an official custom, policy, or practice.” Johnson v. Blaukat, 453 F.3d 1108, 1114 (8th Cir.2006) (citing Monell v. Dep’t. of Soc. Servs. of N.Y.C., 436 U.S. 658, 690-91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). And this custom, policy, or practice must be “the ‘moving force’ behind the violation.” Patzner v. Burkett, 779 F.2d 1363, 1367 (8th Cir.1985) (quoting Monell, 436 U.S. at 694, 98 S.Ct. 2018). “Moreover, the plaintiff must show not only that a policy or custom existed, and that it was causally related to the plaintiffs injury, but that the policy itself was unconstitutional.” Id. at 1367 (citing Polk Cnty. v. Dodson, 454 U.S. 312, 326, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981)).
The jury found Dodge County liable for failing to implement reasonable suicide prevention practices. Luckert highlights six claimed deficiencies in Dodge County’s practices, which Luckert argues support the verdict: (1) “failure to treat inmates who have been identified as mentally ill”; (2) “failure to supervise staff’; (3) “failure to monitor and properly administer [Sampson’s] medication”; (4) “inadequate recordkeeping”; (5) “falsification of [Sampson’s] records”; and (6) “failure to investigate and correct deficiencies after [Sampson’s] death.” None of these alleged deficiencies demonstrate Dodge County had a custom, policy, or practice violating Sampson’s constitutional rights and causing Sampson’s suicide. Some of these claims are unsupported by the evidence, others did not contribute to causing Sampson’s suicide, and some occurred after Sampson’s suicide and thus are not probative to the issue at hand. See, e.g., Liebe, 157 F.3d at 580 (reasoning “focus on the County’s lack of corrective actions after the suicide misses the mark .... [because] failure to act occurring after the date of suicide does not show that the County was deliberately indifferent to the risk of a suicide ... nor does it show that the County tacitly authorized any unconstitutional conduct”). Luckert effectively has shown flaws in Dodge County’s practices, but has not demonstrated the “continuing, widespread, persistent pattern of constitutional misconduct” necessary to find the county liable. Jenkins v. Cnty. of Hennepin, Minn., 557 F.3d 628, 634 (8th Cir.2009) (quoting Mettler v. Whitledge, 165 F.3d 1197, 1204 (8th Cir.1999) (internal quotation marks omitted)). “While we expect that jailers will learn from their failures in preventing suicide, they are not constitutionally liable for every failure, only those where they are deliberately indifferent to the risk of suicide.” Gregoire, 236 F.3d at 419. Dodge County is entitled to judgment as a matter of law.
III. CONCLUSION
Because all of the appellants are entitled to judgment as a matter of law, it is unnecessary to address their remaining claims. We reverse the district court’s denial of the appellants’ motion for judgment as a matter of law and vacate the district court’s award to Luckert of compensatory and punitive damages, as well as attorney fees and costs.

. "We recite the facts in the light most favorable to the jury’s verdict[ ].” Der v. Connolly, 666 F.3d 1120, 1123 (8th Cir.2012) (quoting White v. McKinley, 605 F.3d 525, 528 (8th Cir.2010)) (internal quotation marks omitted).

. DCJ's log sheets reflect one missed watch per day between August 2-4 and five missed watches on both August 5 and 6. The log sheets show no missed watches for the three days before or the day of Sampson's suicide.

. Dr. O'Neill wrote a synopsis of Sampson's psychiatric history on August 1. Julian testified she received this report on August 5. Dr. O’Neill also included outpatient progress notes from July 19, 20, and 24, 2006. Dr. O’Neill listed the following as Sampson’s diagnostic impression:
Adjustment Disorder with Depressed Mood and Anxiety with Subsequent Worsening of Headaches; Posttraumatic Stress Disorder (from being abused in Mexican prison); Personality Change Secondary to Head Injury with Worsening of Pre-existing Antisocial and Paranoid Personality Disorder (can appear psychotic under stress); Cannabis Dependence (he likely does use to self-medicate for headaches); Personality Disorder, Not Otherwise Specified, with Antisocial and Paranoid Features; Probable Post Concussive Headaches, Secondary to Concussion and Head Injury (from being hit with pistol in 1998).

. In his August 3 Request for Medical Care, Sampson wrote, "What are these drugs you are giving me? Id [sic] like a drug fact sheet + side effect. Wish to see Nurse[J No Cymbalta! Could you please get an American psychiatrist that speaks clear English or let me see my own psychiatrist.” On Sunday, August 6, before Julian responded, Sampson submitted another Request for Medical Care, writing, "Need to be transferred to Norfolk Regional Center to Dr. Stephen O’Niell [sic] or I will die in here. My head is killing me. These meds are making me sick [and] confused.” That same day DCJ officials reported Sampson said he was no longer going to eat and did not eat one meal.

. The dissent focuses heavily upon what Julian failed to do. See post 821 to 23. While what Julian did not do is relevant to the inquiry, our precedent is clear that, because jail officials such as Julian "did not have the benefit of twenty-twenty hindsight, as we do now,” our primary focus is on "those precautionary measures which were undertaken.” Liebe v. Norton, 157 F.3d 574, 578 (8th Cir.1998).