# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 23-1367

———————————————

Sandra Jones, Personal Representative of the Estate of Antonio L. Jones, Deceased

*Plaintiff - Appellant*

v.

Faulkner County, Arkansas; Garry Stewart, M.D.; Individually; Karen Grant, Individually; Leanne Dixon, Individually

*Defendants - Appellees*

—————————

Appeal from United States District Court
for the Eastern District of Arkansas - Central

—————————

Submitted: September 25, 2024
Filed: March 20, 2025

—————————

Before GRUENDER, KELLY, and GRASZ, Circuit Judges.

—————————

KELLY, Circuit Judge.

After her son, Antonio Jones,[1] died in the Faulkner County Jail, Sandra Jones brought this action under 42 U.S.C. § 1983 and Arkansas state law against jail

_____

[1]We refer to Antonio by his first name to avoid confusion with Appellant Sandra Jones.

officials Garry Stewart, Karen Grant, and Leanne Dixon. Jones asserted that all three defendants violated Antonio's Fourteenth Amendment rights by exhibiting deliberate indifference to his serious medical needs and that Stewart, the medical director of the jail, committed medical malpractice.[2] Jones also sued Faulkner County, asserting that its policies caused Antonio's death. The district court[3] granted summary judgment for the defendants, and Jones appealed. After careful review, we affirm.

I.

On August 8, 2019, law enforcement arrested Antonio on a felony warrant for failure to pay child support.[4] Antonio arrived at the Faulkner County Jail that morning, and Officer Thomas Samanich began the intake process around 10:00 a.m. Around 3:00 p.m., Samanich retrieved Antonio from his cell for fingerprinting. The fingerprinting "took longer than normal" because Antonio "was very unsteady," "shaky," and "clammy." Samanich decided to take Antonio's vitals because Antonio's condition appeared "abnormal" to him. To do so, Samanich took Antonio to an area near the booking station and handcuffed him to a bench. Around 3:15 p.m., Medical Assistant Leanne Dixon[5] came to the booking station to deliver paperwork. Dixon saw Antonio and noticed that he was "shaking vigorously, sweating," and

---

[2]Jones raised additional state law claims against Grant and Faulkner County, but she does not challenge their dismissal on appeal.

[3]The Honorable Billy Roy Wilson, United States District Judge for the Eastern District of Arkansas.

[4]For purposes of this appeal, defendants' statements of fact, as set forth by the district court, are undisputed. Any additional facts we draw from the record we view in the light most favorable to Jones. See Gregoire v. Class, 236 F.3d 413, 416–17 (8th Cir. 2000).

[5]As a medical assistant, not a nurse, Dixon's duties were primarily administrative.

"had red eyes." Around this time, Samanich was trying to take Antonio's vital signs, which included "blood pressure, pulse, respiration, temperature, [and] pulse ox."[6]

Dixon began to assist Samanich, but they could not get a pulse or blood pressure reading because Antonio was shaking too much. Dixon and Samanich asked Antonio if he had "done any drugs or ingested any drugs," and he said no. At 3:19 p.m., Dixon called Nurse Karen Grant, the most senior medical staff present at the Jail, to tell her what was going on. Dixon told Grant "that [Antonio] was shaking, sweating, eyes were really bad, and that Samanich was getting his vitals." Grant instructed Dixon to measure Antonio's blood sugar because of his symptoms. Antonio's blood sugar levels were normal, but they could not measure his blood pressure because he was still shaking.

At 3:23 p.m., Dixon called Grant again to report Antonio's normal blood sugar results and the fact that she and Samanich were not able to measure his blood pressure. Grant asked Dixon if Antonio was coherent, and Dixon said that he was "talking to the officers," but he was "sweaty" and "a little bit shaky." Grant knew that the inability to measure Antonio's blood pressure was "not unusual" because the jail used "electronic blood pressure cuffs" which often fail to get accurate readings on a person who is shaking. Grant instructed Dixon to place Antonio on a four-hour medical watch, meaning that the officers would check on him every fifteen minutes, record his condition on a medical log sheet, and take his vitals every hour. After passing Grant's instructions on to Samanich, Dixon returned to the nurse's office where she told Grant in person everything she had previously told her over the phone. Soon after, Dixon's shift ended, and she left the Jail.

The medical watch log indicates that Grant ordered the watch to begin at 3:25 p.m., at which time Antonio was "shaking and sweating." At 3:30 p.m., Antonio's condition was noted as "on bench shaking." At 3:45 p.m., his condition was "on bench shake." At 4:00 p.m., the notation simply stated, "on bench." At 4:15 p.m.,

_____

[6]"Pulse ox" is a measurement of oxygen in the blood.

-3-

and again at 4:30 p.m., Antonio's condition changed to "on bench grunting." At 4:45 p.m., Antonio had stopped shaking so severely, and one of the officers was able to obtain his blood pressure, which was 103/85. Sergeant Calene Scott relayed the blood pressure results to Grant, who was not concerned because they were "within normal parameters." Scott added that Antonio was still shaking, and Grant asked, "I don't know if he's on something. Have you guys asked him?" Scott replied that yes, they had asked, and that Antonio denied taking anything.

At 4:59 p.m., Scott called Grant again and told her that Antonio's nose was bleeding. She asked whether it was bleeding or gushing, and Scott replied that Antonio was throwing up blood, grunting, and had blood coming out of his nose. Scott asked Grant to come check on Antonio immediately. Grant told Scott to "get him on a trashcan" and headed to the booking station. Grant arrived at booking by 5:03 p.m. and saw that Antonio's pupils were "fixed and dilated," his body was "cold and clammy," and realized for the first time that "he was sweating buckets." Grant "immediately instructed the officer at the desk to call 911" and began examining Antonio. Grant told the officers to lay Antonio flat on the ground and begin CPR, which they started around 5:09 p.m. and continued until the paramedics "arrived and took over." The officers also tried to revive Antonio with an ammonia tab, Narcan, and a defibrillator, but he was nonresponsive. Antonio was pronounced dead at 5:54 p.m.

The Little Rock, Arkansas, Crime Laboratory performed an autopsy and determined that the cause of Antonio's death was methamphetamine intoxication. When examining the contents of Antonio's stomach, the medical examiner discovered a "small clear plastic bag." The examiner determined that the bag likely contained methamphetamine and that "[t]he drug . . . leached out of the bag, causing overdose and death."

Jones filed this action on behalf of Antonio on May 21, 2021. She asserted that defendants exhibited deliberate indifference to Antonio's serious medical needs in violation of the Fourteenth Amendment, that Stewart committed medical malpractice under Arkansas law, and that the Jail's policies directly caused Antonio's death. As Stewart was not involved with Antiono's care, Jones's claims against Stewart were based on his role as the Jail's medical director. The district court granted summary judgment for defendants. The court determined that Dixon, Grant, and Stewart were not deliberately indifferent, and that Jones could not make out a medical malpractice claim against Stewart because there was no doctor-patient relationship. The court also dismissed the municipal liability claim against Faulkner County, concluding that no Jail policy caused Antonio's death.

Jones appeals the district court's entry of summary judgment for Dixon, Grant, and the County on the federal claims, and she challenges the court's exercise of supplemental jurisdiction over the state law claim against Stewart.

II.

A.

We review a district court's finding that defendants are entitled to qualified immunity de novo. See Shannon v. Koehler, 616 F.3d 855, 861–62 (8th Cir. 2010). "A government official is entitled to qualified immunity on a § 1983 claim unless (1) 'the facts shown by the plaintiff make out a violation of a constitutional or statutory right,' and (2) the 'right was clearly established at the time of the defendant's alleged misconduct.'" Thompson v. Dill, 930 F.3d 1008, 1012 (8th Cir. 2019) (quoting Estate of Morgan v. Cook, 686 F.3d 494, 496 (8th Cir. 2012)). "If there is no constitutional violation, however, we need not proceed further." Smith-Dandridge v. Geanolous, 97 F.4th 569, 575 (8th Cir. 2024) (quoting Scheffler v. Molin, 743 F.3d 619, 621 (8th Cir. 2014)).

We analyze Jones's deliberate indifference claims against Grant and Dixon under the Fourteenth Amendment's due process clause, <u>Poemoceah v. Morton County</u>, 117 F.4th 1049, 1055 (8th Cir. 2024), relying on Fourteenth and Eighth Amendment cases alike, <u>Hott v. Hennepin County</u>, 260 F.3d 901, 905 (8th Cir. 2001). "A plaintiff claiming deliberate indifference must establish objective and subjective components." <u>Thompson v. King</u>, 730 F.3d 742, 746 (8th Cir. 2013). "The objective component requires a plaintiff to demonstrate an objectively serious medical need," while "[t]he subjective component requires a plaintiff to show that the defendant actually knew of, but deliberately disregarded, such need." <u>McRaven v. Sanders</u>, 577 F.3d 974, 980 (8th Cir. 2009) (quoting <u>Vaughn v. Gray</u>, 557 F.3d 904, 908 (8th Cir. 2009)). This latter component requires the official to "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . draw the inference." <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994). However, "the district court can infer knowledge if the risk was obvious." <u>Letterman v. Does</u>, 789 F.3d 856, 862 (8th Cir. 2015) (collecting cases).

Defendants do not dispute that Antonio's medical need was objectively serious, so we address only the subjective component.

We begin with Grant. Jones argues that Grant was deliberately indifferent to Antonio's serious medical need because she knew he "needed immediate medical attention and disregarded that need." At the same time, Jones argues that Grant purposefully avoided learning enough information to appreciate the risk of harm. "We must look at [Grant's] actions 'in light of the information [s]he possessed at the time, the practical limitations of [her] position and alternative courses of action that would have been apparent.'" <u>Letterman</u>, 789 F.3d at 865 (second and third alterations in original) (quoting <u>Gregoire v. Class</u>, 236 F.3d 413, 419 (8th Cir. 2000)).

The only information Grant knew after the 3:19 and 3:23 p.m. calls from Dixon was that Antonio was shaking, sweating, and had "really bad" eyes. Grant responded by putting Antonio on a medical watch, with instructions to call her with updated vitals. This was not deliberate indifference. <u>See</u> <u>Gregoire</u>, 236 F.3d at 418

("If an official completely disregarded a phone call . . . alerting the official to a . . . risk, such act may well constitute deliberate indifference," but "tak[ing] some action to respond to the risk" is not deliberate indifference.); Luckert v. Dodge County, 684 F.3d 808, 818 (8th Cir. 2012) (noting that putting a detainee on a suicide watch does not show apathy or lack of concern).

By the time Scott called with the normal blood pressure numbers, around 4:45 p.m., it was reasonable for Grant to believe Antonio was improving because his shaking had lessened, finally permitting the blood pressure machine to get a reading. See A.H. v. St. Louis County, 891 F.3d 721, 727 (8th Cir. 2018) (continuing to monitor the risk of harm was an "exercise of professional judgment," which, "even if negligent, falls well short of deliberate indifference"). Grant asked Scott whether Antonio was "on something," and Scott told her Antonio denied taking any drugs. See Smith-Dandridge, 97 F.4th at 577 (noting that "[i]t was reasonable for defendants to take [the plaintiff's] response into account" where the plaintiff stated he was not at risk of suicide and later died by suicide). Less than fifteen minutes later, when Grant was asked to attend to Antonio for the first time, she immediately went to the booking station. When she saw him at 5:03 p.m., Grant ordered the officers to call emergency services and began resuscitative care. This too was not deliberate indifference.

Even if, in hindsight, Grant could have done more, or done it faster, that alone does not amount to deliberate indifference. See Logan v. Clarke, 119 F.3d 647, 650 (8th Cir. 1997) ("Although the prison doctors may not have proceeded . . . as quickly as hindsight perhaps allows us to think they should have, . . . [t]he doctors made efforts to cure the problem in a reasonable and sensible manner."); Gregoire, 236 F.3d at 419 (explaining that, if the defendant had known all the relevant information, "a quicker attempt to [respond to the risk] may have been warranted," but we limit our review to the information known at the time). Ultimately, Grant did not disregard any information she was given about Antonio's condition, and she took affirmative steps to respond to the situation as it developed. Cf. Vaughn, 557 F.3d at 910 (finding deliberate indifference where officers "took no action to investigate, or otherwise

respond to, the objective medical symptoms of [the defendant]" for seven hours). Based on what Grant knew at each relevant moment in time, it cannot be said that "the measures taken were so inadequate as to be deliberately indifferent to the risk." Luckert, 684 F.3d at 818 (quoting Rellergert v. Cape Girardeau County, 924 F.2d 794, 796 (8th Cir. 1991)). Because Grant was not deliberately indifferent to Antonio's medical needs, Jones failed to establish a constitutional violation, and Grant is entitled to qualified immunity.

We turn to Dixon, keeping in mind she is not a medical professional and her main duties as medical assistant for the Jail consisted of filing and billing. We have noted that "[p]rison officials lacking medical expertise are entitled to rely on the opinions of medical staff regarding inmate diagnosis." Holden v. Hirner, 663 F.3d 336, 343 (8th Cir. 2011). Here, Dixon realized that something was wrong, called her superior—a nurse, and followed her superior's instructions. She was involved in Antonio's care for approximately ten minutes. Jones points to no evidence to suggest that Dixon subjectively appreciated the substantial risk of serious harm or that she disregarded any such risk. Thus, Dixon was not deliberately indifferent to Antonio's medical needs, and she is entitled to qualified immunity.

We affirm the district court's entry of summary judgment for Grant and Dixon on the deliberate indifference claims.

B.

Next, we turn to Jones's municipal liability claim against the County under § 1983. She argues that the Jail's policy prohibiting officers from sending detainees to the emergency room without the nurse's approval caused Antonio's death. However, "absent a constitutional violation by a [county] employee, there can be no § 1983 or Monell liability for the [County]." Whitney v. City of St. Louis, 887 F.3d 857, 861 (8th Cir. 2018); see also Sanders v. City of Minneapolis, 474 F.3d 523, 527 (8th Cir. 2007) ("Without a constitutional violation by the individual [defendants], there can be no § 1983 or Monell . . . municipal liability."); Brabbit v. Capra, 59 F.4th 349,

354 (8th Cir. 2023) ("Because there is no cognizable constitutional violation, there is no basis for <u>Monell</u> liability."). We affirm the district court's entry of summary judgment for the County.

C.

Finally, we consider Jones's argument that the district court erred by exercising supplemental jurisdiction over her state law claim against Stewart.

"We review a district court's exercise of supplemental jurisdiction over state claims after federal claims have been resolved for abuse of discretion." <u>Marianist Province of the U.S. v. City of Kirkwood</u>, 944 F.3d 996, 1003 (8th Cir. 2019). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." <u>Grain Land Coop v. Kar Kim Farms, Inc.</u>, 199 F.3d 983, 993 (8th Cir. 1999) (quoting <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343, 350 n.7 (1988)). "However, this rule is not inflexible," and a district court does not abuse its discretion by exercising supplemental jurisdiction over state law claims after investing "considerable resources . . . in arriving at its summary judgment ruling." <u>Id.</u>; <u>cf.</u> <u>Marianist Province</u>, 944 F.3d at 1004 (finding no investment of "extraordinary resources" where the court "spent only one paragraph disposing of [the state claim] and cited no case law to support its findings").

Jones challenges the district court's failure to explain its reasoning for exercising supplemental jurisdiction over the medical malpractice claim. But she points to no authority requiring the district court to expressly explain its reasons, and Jones never asked the court to explain its exercise of supplemental jurisdiction. Even on appeal, she fails to argue how "the balance of factors" weighs in favor of declining to exercise supplemental jurisdiction here. <u>See</u> <u>Marianist Province</u>, 944 F.3d at 1003 (quoting <u>Carnegie-Mellon Univ.</u>, 484 U.S. at 350 n.7). Thus, Jones has failed to

convince us that the district court abused its discretion in resolving her state law claim alongside her federal claims.

III.

We affirm.

_____